IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 9, 2007 Session

## STATE OF TENNESSEE v. FRANK BRZEZOWSKI

**Direct Appeal from the Circuit Court for Benton County
No. CR1092      Julian P. Guinn, Judge**

---

**No. W2005-02619-CCA-R3-CD  - Filed June 1, 2007**

---

The defendant, Frank Brzezowski, was convicted of two counts of aggravated assault and three counts of aggravated rape and was sentenced to an effective term of twenty-two years to be served at 100%.  On appeal, he argues that: (1) the evidence was insufficient to support his convictions; (2) the trial court erred in denying his motion for new trial; and (3) the trial court erred in its sentencing determination.  Upon our review of the record and the parties' briefs, we affirm the defendant's convictions, but remand for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part;
Case Remanded**

J.C. McLin, J., delivered the opinion of the court, in which David G. Hayes and Norma McGee Ogle, JJ., joined.

Robert T. Keeton, III, Huntingdon, Tennessee, for the appellant, Frank Brzezowski.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; G. Robert Radford, District Attorney General; and Elizabeth Boswell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### BACKGROUND

On June 7, 2004, the defendant was indicted on two counts of aggravated assault and three counts of aggravated rape.  A jury trial was conducted on April 27 and 28, 2005,  from which we summarize the following testimony relevant to this appeal.

Thomina Alexander, the victim, testified that she was a forty-six-year-old, married woman with an adult daughter.  Throughout her life, she has battled mental disorders and suffered from anxiety and depression.  She was hospitalized a couple of times in 1992 and 1993.  The last time she

was hospitalized was in 2002. At that time, the victim was separated from her husband and dealing with the stress of going through a divorce. She has been diagnosed as having paranoid schizophrenia and severe anxiety disorder, which she manages with medications. She also sees a psychiatrist, Dr. Donald Gold, on a regular basis.

The victim first met the defendant at the Elk's Lodge, and their friendship evolved into a sexual relationship when the defendant helped her through her marital problems. Because the defendant was impotent, the nature of their physical relationship involved touching and oral sex, rather than sexual intercourse. She explained that over the course of their relationship the defendant became more possessive and controlling and was "[i]nsanely jealous" of her male friends. The defendant was aware of her mental health problems.

The defendant told the victim he was a volunteer policeman, but she later found out that was not true. The defendant had been a police officer before he moved to Tennessee. The defendant told her that he was friends with members of the Camden Police Department and Benton County Sheriff's Department.

On Wednesday, May 28, 2003, the defendant was at the victim's house drinking wine when one of her friends, Duane[1] Short, called to tell her that he had bought a new car. The defendant started "acting strange and scary" and saying that he had people "knocked off. That they would just disappear and nobody would know what happened to them." The victim asked Mr. Short to come pick her up and show her his new car. When the victim asked the defendant to leave, he became "very, very irate" but soon left. Mr. Short pulled into the victim's driveway, and the defendant pulled in behind him and flashed his headlights. The defendant then pulled out of the driveway, and Mr. Short and the victim also left. However, the defendant pulled up behind them and chased them for ten to fifteen minutes before they lost him. The victim and Mr. Short drove around until about 2:00 a.m. because she was afraid to return home. She did not tell Mr. Short about her affair with the defendant. When she returned home, the defendant called and cursed at her for leaving with Mr. Short.

The following morning, Thursday, May 29, 2003, the defendant came over to the victim's house and threatened to tell her husband that she was having an affair. The victim was afraid that such a revelation would impair her chance of receiving alimony. The defendant left, but then called later that night wanting to come to her house. The defendant arrived and immediately "went berserk." He choked the victim and held a knife to her throat threatening to slit it. The defendant cut his thumb in the process, and it bled on the victim's shirt and the carpet.

On Friday, March 30, 2003, the defendant appeared on the victim's back porch and banged on the door to be let in. He again threatened to tell the victim's husband about their affair if she did not open the door. The defendant promised the victim he would not hurt her. Once inside, the

---

[1] Mr. Short's first name appears as DeWayne and Duane in the record. We utilize the spelling reflected in the trial transcript.

defendant began arguing about the victim leaving with Mr. Short on Wednesday night. While they were arguing, Mr. Short dropped by the victim's house and the defendant tried to start a fight with him. Mr. Short told the defendant that "violence doesn't solve anything," to which the defendant replied that "violence solves everything." The defendant left after Mr. Short refused to fight, and Mr. Short helped the victim change the lock on her door because she was afraid of the defendant and knew he had a key to her house. The victim said that the defendant always carried a gun.

The defendant called the victim that night after midnight and kept her on the phone until around 4:00 a.m. when he said that he was coming over to her house. When the defendant arrived, he choked her, shoved her on the couch, and stuck a silver or pewter color gun with a small barrel in her mouth, "busting" her upper and lower lips. The victim struggled and somehow managed to remove the gun from her mouth. The defendant asked her questions about whether Mr. Short touched her or had sex with her, and when she would say no, the defendant would say "wrong answer" and threaten to shoot her. The defendant also slapped her over her right and left eyes.

Afterward, the defendant made the victim go to her bedroom and get undressed. The defendant also got undressed, and they sat on the bed and argued. One time the defendant got mad at the victim and pulled some of her hair out. The defendant let the victim have a cigarette, but he grabbed it and threatened to burn her, but somehow burned his own finger. The victim began to have diarrhea and told the defendant she had to go to the bathroom. She returned from the bathroom but had to go once again. The second time, the defendant burst into the bathroom and asked if she was calling the police. The defendant stood in the bathroom door, and when she finished, the defendant shoved her and she fell against the bathtub.

The victim recalled that the defendant then forced her back into her bedroom where he slapped her around and pulled out more of her hair. The defendant laid down on the bed, pulled the victim on top of him, and bit her nipples very hard. The victim screamed and begged the defendant to stop. The defendant then made the victim lie down on the bed and spread her legs. He stuck the gun in her vagina and told her he was going to blow her away. The defendant made the victim lay on her side, and he stuck the gun in her rectum which caused her to defecate on the bed. After that, the defendant made the victim perform oral sex on him, but he got mad because she was not acting enthusiastic about it.

The victim testified that after the oral sex incident, she curled up on her side and cried. The defendant put his hand on her leg and asked her what was wrong. All of this occurred between 4:30 a.m. and 9:00 a.m. The defendant allowed the victim to call her mother, which was part of her morning routine. When her mother asked her if something was wrong, she told her no. Before leaving, the defendant told the victim

> "I know you had a pretty -- a bit of a rough night last night." But, he said, "I had to do what I did to show you that nobody f[]cks me over, and to show you that you can't do this to me, and to show you that I love you."

And then he said, "You better not tell the police what happened." And he said, "You better not tell anybody."

And he said, "If you tell anybody," he said, "your family's lives will be in danger."

And he said, "And, anyway, who do you think they would believe, you or me?"

And he said, "Well, I was Cecil Wells' right-hand man and I'm friends with all the deputies."

And he said, "And you've been in Western State before." He said, "If you went to them and told them," he said, "they will lock you up in Western State."

As he was leaving the victim's house, the defendant demanded a copy of the new key to her house by the afternoon.

The victim testified that she knew the defendant would try to hurt her again or perhaps kill her if he had the new key to her house so she went to her mother's house and told her what happened. The two of them then went to the victim's brother's house and told him about the assaults. Her brother urged her to go to the hospital, but she was afraid to go to the hospital in Camden.

On Monday, June 2, 2003, the victim sought medical attention at the hospital in Jackson. The examination revealed bruises on her neck and chest. A pelvic exam was not conducted at the hospital in Jackson. The next day, Mr. Short and Linda Dotson accompanied the victim to the Benton County Sheriff's Department. Sergeant Bryant Allen interviewed the victim and took pictures of her injuries. The victim admitted that she did not tell Sergeant Allen about her affair with the defendant until a second interview. It was arranged for the victim to go to the Sexual Assault Resource Center in Memphis where she was thoroughly examined.

On cross-examination, the victim testified that she took medication to keep calm, even though there was a period of time when she did not take it. The victim admitted that she spent most of the nights between the assaults and when she reported the incidents to the police in her home. The victim stated that on Thursday, May 29th, the defendant told her that he had planted drugs in her house the night before and that he would call the police and tell them she had drugs. That night, the defendant called her and she begged him to remove the drugs. The victim recalled that the defendant arrived with an empty case and a case containing his guns. The defendant went throughout the victim's house and removed bottles and bags of various drugs. The defendant made the victim follow him to his house, and then she went back home. The victim said she did not mention the drug incident during her direct examination because the prosecutor told her not to because the defendant was not charged with any drug offenses. The victim admitted that she participated with her daughter

in telling a lie that her daughter's car had been stolen, when it had actually been wrecked.

Dr. Jim Craig, an emergency room physician in Jackson, testified that he treated the victim on June 2, 2003, concerning her complaint of being assaulted. Dr. Craig said that the victim was cooperative, but somewhat anxious and nervous. The victim had injuries to her lip, around her mouth, her right arm, left buttocks, and right breast. The victim also had an injury to her forehead. The victim told Dr. Craig that the person who assaulted her placed a pistol in her vaginal and rectal areas, but he did not conduct a pelvic exam or collect a rape kit. Dr. Craig said that he received the victim's mental health history and had the authority to commit her, if medically necessary. However, Dr. Craig did not commit the victim or refer her for mental treatment because he did not observe any signs that might necessitate such treatment. Dr. Craig contacted the Camden Police Department as part of the hospital's protocol regarding assault complaints. Dr. Craig said that the victim reported that her wrist had been cut, but he apparently did not indicate an injury to her wrist on the examination template.

Nurse Rachell Copeland with the Memphis Sexual Assault Resource Center testified that she saw the victim on June 4, 2003. The victim relayed the events of the previous days to Nurse Copeland. Nurse Copeland was aware of the victim's history of mental illness and had the authority to commit her if necessary. However, Nurse Copeland determined that the victim was stable enough to go home and did not think a medical commitment was needed.

Nurse Copeland conducted a pelvic exam of the victim and did not find any injuries to her vaginal or rectal areas. Nurse Copeland said that penetration does not always cause injuries. The victim did have bruises on her arms, above her right eye, on her right breast, and left buttocks. She also had a scratch on her right hand and a cut injury to her left wrist.

Lawrence James, II, agent and forensic scientist with the Tennessee Bureau of Investigation "TBI," testified that he investigated the victim's house on June 4, 2003. Agent James found a thin blood smear of the defendant's blood on the door facing of the victim's bedroom, and a clump of hair beside the night stand. He found a blood stain on the rear left sleeve of the victim's gray t-shirt and the blood matched the defendant. No DNA evidence was found on a black knife recovered from the defendant's vehicle. Agent James analyzed the comforter from the victim's bed and did not find any semen but did find a blood stain matching the victim. Agent James received a Smith & Wesson .38 caliber revolver which he analyzed. He did not see any blood or skin on the gun, but he got a partial DNA profile from the barrel end and the grip area of the gun that matched the victim. Agent James explained that a partial profile means that more than one person contributed to a mixture, and in this case, the victim was the major DNA contributor. Based on his experience, Agent James said that a person just handling a gun would leave no DNA or at most a trace. He said that the DNA he recovered from the weapon was more consistent with moist skin contact rather than dry skin contact.

On cross-examination, Agent James said that it was a possibility there would be a good DNA result if someone engaged in digital sex and then picked up a gun. Agent James stated that he had no way of controlling what took place in the victim's house during the five days between the incident

and the day he conducted his investigation of the victim's house. Agent James admitted that blood transferred from a bloody cotton ball could have accounted for the stain on the door and on the t-shirt.

Duane Short testified that he had known the victim for about twenty-seven years, and he went to her house on Wednesday, May 28, 2003, around 9:00 p.m. to show her his new car. Before they could pull out of the victim's driveway, a truck pulled in behind Mr. Short's vehicle and flashed its lights. The vehicle then followed Mr. Short and the victim around for about ten minutes. Mr. Short learned later that the vehicle belonged to the defendant. The victim was afraid to go home and seemed very nervous and upset.

Mr. Short dropped by the victim's house on May 30th on his way to his brother's house because he saw the truck that had followed them Wednesday night parked in her driveway. In the defendant's presence, the victim told Mr. Short that the defendant had planted drugs in her house that Wednesday night. The defendant said to Mr. Short, "do you know what she did. . . . [M]e and her was sitting here drinking wine that night when she asked me to leave to go riding with [you]." Mr. Short said to the defendant, "where was your wife," and the defendant became outraged and cursed at Mr. Short. In a rage, the defendant tried to get Mr. Short to go outside and fight, and Mr. Short laughed and said he did not have time for that. The defendant said that "he was going to take care of both us, me and her both," which Mr. Short took to mean he was going to kill them. Mr. Short told the defendant that violence did not settle anything, to which the defendant responded that violence settled everything. The defendant finally calmed down and walked out. Apparently the defendant had not left because he knocked on the door, walked back inside, and asked Mr. Short if he could help him get the tadpoles out of the victim's swimming pool. Mr. Short told the defendant that he did not need any help. Mr. Short then went with the victim to get new locks for her house and changed them. Mr. Short was worried and contacted his friend, Linda Dotson, to help the victim, since she was terrified of the defendant.

Mr. Short testified that he saw the victim on Sunday, June 1st, and she was hysterical, emotional, and shaky. At some point after the rape, Ms. Dotson arranged to meet with the victim. Mr. Short took the victim to the hospital in Jackson and then to the sheriff's department where Ms. Dotson met with them. On cross-examination, Mr. Short recalled that the defendant did not try to run him and the victim off the road on Wednesday night, he just followed them around. On redirect examination, Mr. Short explained that he did not take the victim to the local hospital because the defendant had informed the victim that he was a police officer and was friends with the local police chief.

Linda Dotson testified that she met with Mr. Short on Sunday, June 1st and learned that the defendant had raped the victim and that the victim was afraid to go to the authorities. On Monday, June 2nd, Ms. Dotson went to the Benton County Sheriff's Department and spoke with a couple of officers about the victim. Ms. Dotson met with the victim the following morning, and she was very distraught and feared for her life and family. The victim gave Ms. Dotson items from the assault and a knife belonging to the defendant. Ms. Dotson said that when she arrived at the sheriff's department

-6-

she found out that the defendant had given a box of knives to each of the officers as gifts, and those knives were the same as the one the victim had given her. Ms. Dotson collected hair from the victim's house, a t-shirt with blood on it, and the telephone with caller ID. Ms. Dotson got the victim to go to the sheriff's department where the victim met with Sergeant Allen who videotaped the victim's injuries.

On cross-examination, Ms. Dotson said that the victim was wearing the t-shirt that she took to the police, and the hair was found in a little clump on the victim's bed. She believed the knife came from the kitchen. Ms. Dotson clarified the time line of events: she went to the sheriff's department alone the morning of June 2nd, afterward she met with the victim and they collected the evidence, the evidence was in the victim's possession that night, and Ms. Dotson and the victim went to the sheriff's department the next day – June 3rd. Ms. Dotson did not accompany the victim to the hospital in Jackson. Ms. Dotson admitted that she had no independent, first-hand knowledge of the assaults, but she could see the cuts and bruises on the victim's face and body.

Sergeant Bryant Allen with the Benton County Sheriff's Department testified that on Monday, June 2nd, he told Ms. Dotson that she needed to have the victim come in and file a complaint. That same day, Sergeant Allen was notified by Jackson Madison County Hospital that the victim had come in and complained of being assaulted. The victim came to the sheriff's department on June 3rd, and he recorded her statement and videotaped her injuries. Sergeant Allen stated that he received hair, a knife, a phone with caller ID, and a t-shirt from Ms. Dotson. Sergeant Allen said that the knife was not alleged to have been used in the crime, but instead was a gift from the defendant to the victim. Sergeant Allen told the victim to go to the Memphis Sexual Assault and Rape Center for a complete examination.

Sergeant Allen stated that he was familiar with the victim before seeing her on June 3rd, and he had been present during times when her mental condition was an issue. He said that when the victim made the complaint against the defendant, she was completely different than when he had seen her previously. He noted, "Other than being nervous like any of us would, she was in a good state of mind. . . . [S]he was speaking clearly and answered the questions I asked her . . . ." Sergeant Allen explained that they take people to the emergency room if they think a person needs to be committed or hospitalized for mental reasons, and he did not see a need to do that with the victim. Sergeant Allen recalled that the victim initially did not tell him that she had been having an affair with the defendant, but she contacted him about ten days later and disclosed the affair.

Sergeant Allen testified that the defendant was well-known by some of the officers at the sheriff's department and even more so by the officers in the Camden Police Department. The defendant came to the sheriff's department late in the afternoon on June 3rd and parked his car at the restaurant next door. Sergeant Allen explained that any car in the police department parking lot was subject to search at any time. The defendant was *Mirandized* and waived his rights. The defendant said that he could not write very well so Sergeant Allen taped the interview. Sergeant Allen requested and received consent to search the defendant's vehicle for weapons, and his vehicle was later searched a second time. The searches revealed three guns, and the victim identified one

of the guns as the gun used in the rapes.  A bag of knives was also found in the defendant's vehicle.

The next day, Sergeant Allen was told that the defendant wanted to speak with him again, and he conducted a second taped interview.  During the interview, Sergeant Allen took pictures of the defendant's hand because the defendant had cut his hand during the struggle with the victim.  Both of the defendant's taped statements and the video of the victim's injuries were played for the jury.  Sergeant Allen stated that the victim had red marks on her neck that did not show up well on the video.  The victim's eyelid was yellow and "looked like what would eventually develop into a bruise."  The prosecutor directed Sergeant Allen's attention to a segment during the defendant's taped interview where the defendant said that he did not rape the victim, and Sergeant Allen stated that the defendant had not been told at that point that a rape allegation had been made against him.

On cross-examination, Sergeant Allen testified that during the defendant's statement the defendant said that he could have grabbed the victim's arm and bruised it, but he denied beating her head and face and raping her.  The defendant told Sergeant Allen in the second interview that he had been having an affair with the victim.  Sergeant Allen stated that the defendant was aware that serious allegations had been brought against him, but rape had not been specifically mentioned.  Sergeant Allen remembered that the victim told him she had erased about fifty calls off her caller ID of which thirty had been from the defendant.

A deposition taken from James Yeager[2] was read into evidence.  Mr. Yeager was unavailable during trial because he was working in Iraq.  Via his deposition, Mr. Yeager testified that he had known the defendant for eight or nine years and they were both gun enthusiasts.  At the time the rape allegations arose, Mr. Yeager was working as a deputy at the Benton County Sheriff's Department and visited the defendant while he was in jail to try and calm him down.  Mr. Yeager next saw the defendant at his bond hearing.  Mr. Yeager volunteered to take possession of the defendant's numerous firearms until the case was resolved to ensure they were not damaged.  After the defendant was released from jail, Mr. Yeager talked with him by telephone.  During the conversation, the defendant mentioned that he had heard that the guns found in his car were going to be tested for DNA evidence.  The defendant told Mr. Yeager that

> he didn't know how it would be possible for there to be any DNA on any of those firearms.  We were particularly talking about the revolver, the Smith and Wesson .38 revolver.  And he said that he had cleaned that gun thoroughly and for about a half hour and that . . . the gun was immaculate, it was in pristine condition, and there was nothing on it.

On cross-examination, Mr. Yeager agreed that the defendant was a fanatic about cleaning his guns.  Mr. Yeager said that it was his understanding that someone in law enforcement had told the defendant that the particular Smith and Wesson .38 was the gun alleged to have been used in the

---

[2] James Yeager is also referred to as James Jaeger in the record.  We utilize the spelling from his deposition, which is Yeager.

rapes. He stated that the defendant's comment might have seemed innocuous to some, but as a police officer, he felt the defendant's comment "might have been something."

Dr. John Monette, a psychiatrist, testified for the defense. Dr. Monette testified that he reviewed the victim's medical records from the hospital in Jackson, the Sexual Assault Center in Memphis, and her past psychiatric records. After reviewing all the documents, Dr. Monette concluded that the victim is "frequently psychotic with severe breaks with reality. . . . She had to be committed judicially by the courts on a number of occasions in the past 14 years. She's also had to be put under conservatorship." Dr. Monette said that the victim has a medical condition called pathological lying where she makes up extraordinary stories that can come across as credible. The victim is also paranoid schizophrenic. The two hallmarks of paranoid schizophrenia are auditory hallucinations and delusions.

Dr. Monette testified that the physician at the Jackson hospital noted injuries that were not noted by the Sexual Assault Resource Center, and there were injuries noted by the Sexual Assault Center that were not noted by the Jackson physician. Dr. Monette surmised that based on the victim's mental condition it was medically possible that she made up the assaults. Dr. Monette said that an example of the victim's pathological lying was her lying about a car being stolen, when in actuality her daughter wrecked it. The records reflected that the lie about the car happened after the rape allegations. Dr. Monette noted that the victim's left eye in the video looked normal and said that it should not have looked normal if the defendant had "slapped her as hard as he could in her left eye." The right eye had a very slight yellow discoloration meaning it was a very old injury. The victim also has a history of labeling people in her life as abusive.

On cross-examination, Dr. Monette admitted that he had never treated the victim and had based his opinion solely on his review of her records and the information concerning the case. In regard to whether a cut on the victim's wrist was reported by the Jackson physician, Dr. Monette said that the physician did not mention a cut in his physical exam, but he admitted that there was mention of a cut wrist by a nurse. Dr. Monette also admitted that he was aware that the victim's daughter had pled guilty to domestic assault for "beating her mother from head to toe," and therefore, the victim did not make up that claim. Dr. Monette agreed that the defendant, during one of the taped interviews, admitted to biting the victim's breast hard, "accidentally" pulling her hair out, and cutting his hand with his knife, all of which was consistent with the victim's recollection.

The defendant testified that he and the victim had an affair that lasted a little over three years and involved only oral and digital contact due to his impotency. The defendant denied ever striking the victim in the face or sticking a gun in her mouth, vagina, or anus. He did admit to having a "run in" with Mr. Short because Mr. Short tried to aggravate him. The defendant said that he developed a loving relationship with the victim and tried to help her. He denied putting a knife to her throat and threatening to slit it and said that he actually cut his hand trying to open a cake package. The defendant stated that the victim got cotton balls and cleaned up his cut, and she did so on her own because she saw that his hand was bleeding.

The defendant stated that the victim invited him to her house Friday night, May 30th, to have some wine with her. While drinking the wine, the defendant told the victim that he was going to have to break off their relationship because he thought his wife was getting suspicious and he did not think he could help her anymore. The victim was upset and asked why he was abandoning her, but she wanted to have sex one last time. During their encounter, the defendant bit on the victim's breasts and she insisted that he bite harder. He said that he probably bit hard enough to make bite marks on one breast. When asked about the wad of the victim's hair that was pulled out, the defendant explained that they were lying together on the bed and when the victim went to get up, her head was under his arm. However, he said that only four or five strands of her hair were pulled out. The defendant stated that they did not have a fight over a cigarette. He speculated that the victim might have bruised her arms when she pulled away from him while they were cuddling to go to the bathroom. The defendant did not leave a knife at the victim's house. He did not know how the victim's DNA got on his gun, but he said that he picked up his gun and put it in his pocket when he got dressed after their sexual encounter.

The defendant testified that he was kept in the Benton County Jail for three days and was not allowed to call anyone, talk to an attorney, nor was he told what he was charged with. The defendant said that Sergeant Allen asked about a scratch on the victim and that was why he thought she might have made a rape accusation. The defendant said that he never threatened to ruin the victim's divorce. He did not tell the police about the affair initially because he was ashamed. On the second interview, he decided he wanted to come clean and revealed the affair. The defendant noted that the victim had seen his guns many times and knew he carried one. When asked about his conversation with James Yeager regarding his gun, the defendant explained that he had told Mr. Yeager that he had cleaned his gun for purposes of routine maintenance. The defendant stated that he was a police officer in Philadelphia for eight years prior to moving to Tennessee.

On cross-examination, the defendant acknowledged that he was aware of most of the victim's past mental health issues and assumed that she was taking medications. The defendant said that he never worked at the Camden Police Department but that he worked for the sheriff's department, as a dispatcher, jailer, and reserve officer with a deputy card. He knew the majority of the officers at both departments. When asked why he told the officer he did not rape the victim, even though rape had never been mentioned, he responded that he was asked "how she got scratched on her anus" so he assumed they were talking about a sex offense. The defendant admitted that during the first interview, he told Sergeant Allen that he had cut his hand sharpening a knife even though there was nothing wrong with using a knife to open a cellophane snack wrapper. He said that he cuts himself so frequently when he sharpens knives that he forgot that particular cut came from a snack wrapper. In response to his statement on direct examination that he was not allowed to talk to an attorney while he was in jail, the defendant admitted that his attorney found out he was in jail and visited him. The defendant acknowledged that he told Sergeant Allen that he "fingered [the victim] hard up the ass because she was pissing [him] off." The defendant also acknowledged that he never told Sergeant Allen that he had broken up with the victim and that might have been why she brought the allegations. The defendant admitted that several hours passed between his sexual encounter with the victim and when he picked his gun up to get dressed and leave.

Carol Brzezowski, the defendant's wife, testified that she was suspicious of the amount of time the defendant spent with the victim, but once she started taking an anti-depressant her suspicions subsided. Mrs. Brzezowski said that she did question the defendant about his time with the victim because she was concerned that the victim was mentally unstable. She became aware of the affair on the day of the defendant's arraignment.

Dr. Donald Gold, a psychiatrist, testified in rebuttal for the state. Dr. Gold stated that he is the victim's psychiatrist and has been treating her since February 2003. During the time that he has been treating her, the victim has not been hospitalized due to her mental conditions. Dr. Gold said that, by the definitions he is aware of, the victim does not meet the criteria for being diagnosed as a pathological liar. He stated that there is no formal diagnosis of pathological liar in the "diagnostics of the American Psychiatric Association," and the victim does not meet the definition of pathological liar found in medical literature. Dr. Gold testified that he does not recall seeing the term pathological liar in any of the victim's psychiatric records. In looking at the victim's past treatment records, Dr. Gold determined that the victim had been given an incorrect diagnosis and had been receiving medications that were inappropriate for her problem. Dr. Gold prescribed Prolixin, an anti-psychotic medication, and the victim was compliant in taking the medication. The victim called Dr. Gold shortly after the rape, and she seemed distraught and upset but totally coherent.

On cross-examination, Dr. Gold admitted that he treated the victim in October 2003 and she related that she had lied about her daughter's car being stolen when it had actually been wrecked. Dr. Gold recalled that the victim told the lie because her daughter had pressured her to lie. Dr. Gold stated that in May 2003, he was asked to examine the victim to determine her competency in connection with her divorce proceedings. Dr. Gold said that he had a copy of the letter from the lawyer requesting the examination, and a handwritten draft of the letter he sent back in response. Dr. Gold admitted that his May 6, 2003, letter to the lawyer said that the victim "still manifests residual deficits in her ability to function and appears to be very fragile to stress." He agreed that the victim's condition was severe if not properly medicated and managed and that she had a great deal of fear of being abandoned.

Upon the conclusion of the proof, the jury found the defendant guilty as charged to all five counts. After a sentencing hearing, the defendant was sentenced to an effective term of twenty-two years served at 100%.

## ANALYSIS

The defendant raises three issues on appeal. He challenges the sufficiency of the convicting evidence, the denial of a new trial, and the sentencing decision of the trial court.

### Sufficiency

The defendant challenges the sufficiency of the convicting evidence. Specifically, he argues that "[g]iven the alleged victim[']s pathological lying and the unreliability of the physical evidence, reasonable doubt certainly exists."

We begin our review by reiterating the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *Rice*, 184 S.W.3d at 662. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Aggravated rape is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim [when] [f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon[.]" Tenn. Code Ann. § 39-13-502(a)(1). "'Sexual penetration'" means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" *Id.* § 39-13-501(7). An assault is committed when an individual "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(1). An assault is elevated to aggravated assault if the assault is committed intentionally or knowingly and a deadly weapon is displayed or used. *Id.* § 39-13-102(a)(1)(B).

As noted above, the defendant challenges the veracity of the victim's testimony and the reliability of the physical evidence. The defendant argues that the victim's version of the events lacks credibility because she is a "pathological liar." However, questions concerning the credibility of a witness and the weight and value of the evidence presented at trial were resolved by the jury as the trier of fact. By its verdict, the jury accredited the victim's recollection of the events. The victim testified that the defendant inserted a .38 revolver into her vagina and anus while threatening to shoot

her. The defendant also forced the victim to perform fellatio while brandishing the .38 revolver. The victim's testimony was corroborated by TBI Agent James who testified that DNA found on the defendant's Smith & Wesson .38 revolver matched the victim's DNA.

As to the defendant's aggravated assault convictions, the victim testified that the defendant held a knife to her throat and threatened to slit it. The victim said that the defendant cut his thumb while holding the knife to her throat and got blood on the t-shirt she was wearing. Again, DNA analysis of the blood stain on the victim's shirt supported the victim's testimony. The victim also testified that the defendant put a gun in her mouth bruising her lips and mouth area. Dr. Craig testified that the victim had abrasions on her lips and around her mouth. The victim further testified that the defendant repeatedly slapped her across the face, choked her, shoved her into a bathtub, "yanked" out her hair, and bit her breast. The defendant acknowledged that he bit the victim's breast and pulled out some of her hair. Photographs and the videotape of the victim's injuries show that the victim had bruises on her arms, buttocks, bite marks on her breast, and an abrasion on her wrist. In the light most favorable to the state, we conclude that the evidence was sufficient to support the defendant's convictions.

## Motion for New Trial

The defendant next argues that the trial court erred in failing to grant him a new trial due to the insufficiency of the convicting evidence and because of the state's failure to provide all of Dr. Gold's records, specifically exhibit 41, which was an assessment of the victim by Dr. Gold that occurred a few weeks prior to the allegations of rape in this case.

Initially, we note that the defendant has waived this issue for failing to include the transcript from the motion for new trial in the record on appeal. It is the duty of the defendant to prepare a record which conveys a fair, accurate and complete account of what transpired in the trial court with respect to the issues which form the basis of his appeal. Tenn. R. App. P. 24(b); *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983). When the record is incomplete, or does not contain the proceedings relevant to an issue, this court is precluded from considering the issue. *State v. Hopper*, 695 S.W.2d 530, 537 (Tenn. Crim. App. 1985), *perm. app. denied* (Tenn. 1985).

Even if the defendant had not waived the issue, the issue is without merit. First, as determined above, the evidence was sufficient to support the defendant's convictions. Second, as addressed below, the missing psychiatric evaluation is cumulative of other evidence. Accordingly, we conclude the trial court did not err in denying the defendant a new trial, and he is not entitled to relief.

In a motion for pretrial discovery, the defendant requested a copy of Dr. Gold's mental evaluation of the victim taken for the purpose of determining the victim's competency to proceed with her divorce in Benton County Chancery Court. Apparently, a copy of the evaluation was not included in the discovery materials sent to the defense. During cross-examination, the following exchange occurred:

[Defense Counsel]:     [Y]ou said something just a moment ago about competency in the divorce process was resolved.  It's my recollection that she was ordered in May of 2003 to be examined by you for purpose of determination to the Chancery Court whether she was competent or not, was that done?

[Dr. Gold]:     I don't know that I was ordered, but I certainly was requested.  I have a copy of the lawyer[']s letter.

[Defense Counsel]:     Why was I not provided that, Dr. Gold?

[Dr. Gold]:     I don't know.  It's part of her record.

[Defense Counsel]:     May I see the letter?

[Dr. Gold]:     You certainly may.  I brought the original letter. . . .

[Defense Counsel]:     Did you write him a letter back?

[Dr. Gold]:     Yes.  I have the handwritten draft which was later typed up and sent. . . .

The defendant was provided a copy of the evaluation and order, and both were made part of the record.  The defendant did not move for a continuance to have his expert, Dr. Monette, examine the documents.

After the trial, on August 19, 2005, Dr. Monette filed an affidavit stating that he had not received Dr. Gold's May 6, 2003, handwritten letter "which was an evaluation of [the victim and] would have been very pertinent to my testimony in this matter as it was the most recent examination of [the victim] in the time frame before the allegations were made against [the defendant]."  Dr. Monette further stated in his affidavit that the "[f]ailure to have such a recent letter or diagnosis hampered my ability to properly prepare and testify on [the defendant's] behalf as I had to rely on older records not necessarily related to the time."

Upon review, we note that contrary to Dr. Monette's assertion, the "most recent examination" of the victim appears to have occurred on May 19, 2003, during an appointment she had with Dr. Gold.  Dr. Gold's progress notes, which included notes taken during the May 19th meeting, were part of the record and were reviewed by Dr. Monette prior to trial.  Moreover, the information contained in Dr. Gold's May 6, 2003, letter was not new information.  Dr. Gold stated in his letter that the victim had responded well to her medications and that hospitalization was not necessary even though the victim manifested residual deficits in her ability to function and was fragile to stress.  Dr. Gold's treatment records of the victim are replete with notations regarding the victim's depression, stress, and how she felt unprepared to be on her own again.

-14-

The defendant's reliance on *State v. Collins*, 35 S.W.3d 582 (Tenn. Crim. App. 2000), is misplaced. *Collins* involved a prosecutor's refusal to disclose the identity of a confidential informant in defiance of a court order, *see id.* at 585; whereas in this case, the information sought by the defendant was in Dr. Gold's possession and control, not the state's. It appears that Dr. Gold inadvertently forgot to send the letter along with his other records and the prosecutor was as unfamiliar with the letter as was defense counsel. Also, in *Collins*, the defendant alleged that the confidential informant could provide exculpatory testimony which would contradict the charges against him, *see id.* at 583; whereas in this case, Dr. Gold's letter did not present any new information regarding the victim's mental state. In our view, the information in the letter is cumulative of Dr. Monette's testimony that the victim had "severe breaks with reality," is very dependant on other people to care for her, and is "suffering with very low autonomy, very often with fears, paranoid fears." Thus, the trial court did not err in denying the defendant a new trial.

**Sentencing**

The defendant lastly challenges the sentencing decision of the trial court. Specifically, he argues that the trial court must have explicitly rejected the June 7, 2005, sentencing amendment because otherwise he would have received the minimum sentence as "[t]here were no enhancing factors filed in the pre-sentence report . . . , none filed by the prosecution, nor any specifically found by the court as enhancement factors."

Appellate review of a challenged sentence is a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the defendant has the burden of showing that the sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

In conducting our de novo review, this court must consider (1) the evidence received at the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing; (4) the arguments of counsel relative to sentencing alternatives; (5) the nature and characteristics of the criminal conduct involved; (6) any applicable mitigating or enhancement factors; (7) any statements made by the defendant in his or her own behalf; and (8) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

As a Range I offender, the defendant's Class A felony aggravated rape convictions subjected him to a sentence ranging from fifteen to twenty-five years. *See* Tenn. Code Ann. § 39-13-502; §

40-35-112(a)(1). The defendant's Class C felony aggravated assault convictions subjected him to a sentence ranging from three to six years. *See* Tenn. Code Ann. § 39-13-102; § 40-35-112(a)(3). It appears that the trial court and defense counsel verbally agreed that the defendant would be sentenced under the 2005 amendment to Tennessee Code Annotated section 40-35-210, which abolished the midpoint of a range as the presumptive minimum sentence for a Class A felony. *See* Tenn. Code Ann. § 40-35-210, Compiler's Notes.[3]

In sentencing the defendant, the court stated as follows:

> This Court has considered several matters in arriving at what it feels to be an appropriate sentence in this case. One, I have considered the number of instances of exceptional cruelty that the victim was forced to submit to.
>
> Two, I'm of the opinion that this man took advantage of his prior police experience and his then relationship with law enforcement to gain the victim's confidence and exercised an[] uncommon degree of control.
>
> Three, I've considered the differences in the defendant and the victim's mental stability. I think the proof was more than clear that the victim was particularly vulnerable because of her mental instability if not a mental disability.
>
> Four, I've considered the use of a weapon. And I'm well aware that the use of a weapon is an element of both aggravated rape and aggravated [assault]. However, that statute is drawn in such a manner as to make the use of a weapon an element when it's used to accomplish the crime. In this instance it was used as a tool in two of the three instances of aggravated rape.
>
> Five, I'm of the opinion that there were injuries experienced by the victim of both a physical and a mental nature.

The trial court then sentenced the defendant to five years on each aggravated assault conviction and twenty-two years on each aggravated rape conviction and ordered that the sentences be served concurrently.

Again, the defendant argues that because "[t]here were no enhancing factors filed in the pre-sentence report . . . , none filed by the prosecution, nor any specifically found by the court as enhancement factors," he was entitled to the minimum sentence. We first note that the state's decision not to file a notice to seek an enhanced sentence does not preclude the trial court from considering enhancement factors in determining the defendant's sentence. Our supreme court has

---

[3] It does not appear that the defendant actually executed a written waiver of his ex post facto protections; however, it is evident from his argument at sentencing and on appeal that he wished to be sentenced under the amended law.

held that a trial court retains its discretion to consider applicable enhancement and mitigating factors so long as the defendant's sentence is not enhanced beyond the statutory maximum. *See Graham v. State*, 90 S.W.3d 687, 692 (Tenn. 2002); *see also State v. Raymond O. Long, Jr.*, No. M2005-02960-CCA-R3-CD, 2007 WL 551306, at *14 (Tenn. Crim. App., at Nashville, Feb. 23, 2007) (noting that the trial court is not bound by the enhancement factors presented by the state and may apply any factor that is supported by the evidence at the trial, the sentencing hearing, or the pre-sentence report). Accordingly, the trial court was free to enhance the defendant's sentence based on the presence of any factor supported by the evidence.

The record also reflects, contrary to the defendant's assertion, that the trial court found enhancement factors even though it did not refer to the factors by statute section number. Specifically, the trial court determined that the victim was treated with exceptional cruelty, the defendant used his relationship with law enforcement to gain the victim's confidence and exercise an uncommon degree of control over her, the victim was particularly vulnerable due to her mental instability, a weapon was used as a "tool in two of the three instances of aggravated rape," and there were physical and mental injuries suffered by the victim. While there are facts in the record that support the application of some of these factors, our review is hindered, foremost, because the trial court did not address which enhancement factors applied to which conviction. For example, the fact of "exceptional cruelty" may apply to the defendant's aggravated rape convictions, but may be inapplicable to the defendant's aggravated assault convictions. Also, some of the factors mentioned by the trial court may not be applicable because they are inherent in the offenses. "[I]t is incumbent upon the trial court to specify which enhancement factors apply to each sentence, and a failure to do so will often result in a remand." *State v. Crystal Antonette Delaney*, No. W2005-01459-CCA-R3-CD, 2006 WL 1215141, at *3 (Tenn. Crim. App., at Jackson, May 5, 2006).

Our review is also hindered because the trial court failed to state the process by which it arrived at the sentences, *i.e.*, what sentence it started at, what facts it relied on in enhancement or mitigation, and how it weighed and evaluated the factors. *See State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997) (citing *State v. Jones*, 883 S.W.2d 597, 601 (Tenn. 1994)); *see also State v. Donald Luke Seiber*, No. E2004-01794-CCA-R3-CD, 2005 WL 2756055, at *14 (Tenn. Crim. App., at Knoxville, Oct. 25, 2005). Accordingly, we are constrained to remand the case for re-sentencing. On remand, the trial court should specifically articulate which enhancement factors it finds, which facts it relies upon in support of each enhancement factor, whether it finds any mitigating factors, which factors apply to which convictions, and how each factor is weighed and evaluated in arriving at the sentences. Also on remand, the trial court should ensure that the defendant properly executes a waiver of his ex post facto protections if he wishes to be sentenced under the amended sentencing statutes. *See* Tenn. Code Ann. § 40-35-210, Compiler's Notes; *see also State v. Timothy R. Bouton*, No. E2005-02294-CCA-R3-CD, 2006 WL 2373471, at *2 (Tenn. Crim. App., at Knoxville, June 27, 2006) (remanding for re-sentencing under the old law or for proper execution of a waiver of ex post facto protections).

**CONCLUSION**

Based on the foregoing, we affirm the defendant's convictions but remand for a new sentencing hearing.

_____
J.C. McLIN, JUDGE